BROCKETT v. PIPKIN.—149 S. W. (2d) 478.

Middle Section.   November 30, 1940.

Petition for Certiorari denied by Supreme Court, April 5, 1941.

(1)

J. M. McDonald, of Lafayette, for appellant.
H. B. McGinness, of Carthage, for appellee.

FAW, P. J.   The bill in this case was filed in the Chancery Court of Macon County on April 11, 1938, by Ben E. Brockett against Fred S. Pipkin, administrator with the will annexed of M. F. Pipkin, deceased.   The parties are both resident citizens of Macon County, and the above mentioned testator, M. F. Pipkin, was a resident citizen of Macon County at the time of his death.

The case was heard in the Chancery ·Court on the complainant's bill, the defendant's answer thereto, and the oral testimony of wit-

nesses introduced before the Court pursuant to a written agreement of the parties filed in the cause in accordance with Section 10654 of the Code, and on final decree the Chancellor dismissed the complainant's suit and adjudged that the complainant and the sureties on his cost bond pay the costs of the cause, for which execution was awarded. The Chancellor granted an appeal of the complainant from the aforesaid decree and allowed the complainant thirty days from the date of the entry of the order granting the appeal in which to perfect said appeal, and sixty days from that date in which to file a bill of exceptions.

A transcript of the record was filed in this Court as on appeal on December 30, 1939, but thereafter the appeal of the complainant was dismissed, on motion of the defendant, for the reason that the appeal bond had not been filed below within the period of time allowed.

The appellant thereafter filed the transcript of the record in this Court for writ of error, and the case is before us on the transcript of the record, assignments of error and brief for appellant and reply for appellee.

The issues formulated by the pleadings and the essential facts of the case are so clearly stated in the written "Opinion and Finding of Facts" filed by the learned Chancellor that we adopt same as our finding of facts, and quote same in full herein as follows:

"This cause was heard during the regular term at Lafayette, Tennessee, on oral proof, by consent of counsel, argued and taken under advisement until this time. Counsel have also filed briefs in support of their contentions.

"Complainant Ben Brockett seeks to recover from the estate of M. F. Pipkin, deceased, compensation for waiting on deceased for approximately fifteen months.

"The defendant Administrator pleads the Statute of Limitations of seven years, and two years and six months, the Statute of Frauds, and denies that a contract was executed as claimed by complainant, and that the estate is indebted to complainant in any amount.

"The deceased's wife, Lula Pipkin, who died in April 1937, was a sister of complainant Ben Brockett. The deceased was in bad health for several months prior to his death and needed the services of a nurse. He was continually attended by a Physician during the period for which compensation is claimed, and was in the hospital and had an operation, and stayed in the hospital from November, 1923, to February 9, 1924. At the request of the deceased the complainant went to live with the deceased and his wife November 18, 1923. At the time he went there he was working at the Carthage Spoke Company making $3 a day, six days a week. The deceased died May 19, 1925, and the complainant stayed there until that time and rendered satisfactory services to the deceased as a practical nurse. He is not a

trained nurse, but the services he rendered were satisfactory to the deceased and the Physicians of the deceased.

"The complainant married the second time December 14, 1924, and his wife stayed there in the home of the deceased. Complainant's mother was also there and the complainant's small son, who had made his home with the deceased part of the time. The complainant's wife also assisted about the home in whatever capacity she was needed.

"The deceased requested, and the complainant agreed, to stay with him and render the services he did render until he died, according to the testimony of Mrs. Ben Brockett, Dr. H. C. Hesson, Dr. A. Y. Kirby. This service was with the understanding it be paid for. Also, according to the testimony of some of witnesses, especially Mrs. Brockett and Dr. Kirby, the deceased requested and the complainant agreed to stay with the deceased's wife after the death of deceased, which complainant did. Complainant is not seeking any recovery for services rendered the wife of deceased, but insists that the contract he made with said deceased was a continuous contract, and that therefore the Statute of Limitations did not begin to run against his action for services against the estate of deceased until after the death of his widow. M. F. Pipkin made his will April 19, 1917, which is as follows:

" 'I, M. F. Pipkin, of sound mind and disposing memory, desire that as soon after my death as practicable, that all of the expenses of my last sicknesss and burial expenses be paid including a reasonably priced tombstone, the price of which to be fixed by my Executrix, and all other debts that I may owe at that time if any; out of any money that may be on hand or that may first come into the hands of my Executrix.

" '2nd. I bequeath unto my beloved wife M. Lula Pipkin all of my personal property to be used for her comfort and maintenance during her natural life; and at her death if there should be any portion of the same unconsumed, it is my will that one-half of the same go to my kindred according to the laws of descent and distribution and the other half to go to whomsoever my said wife may see fit to designate. All personal property heretofore given to my said wife, consisting of a piano, gold watch and several other small articles are not taken into this bequest, but are hers absolutely.

" '3rd. I devise to my beloved wife M. Lula Pipkin, the home upon which we are now living, consisting of about 5 acres of land, with dwelling house and barn just South of Red Boiling Springs, Tenn., and on the Red Boiling Springs and Carthage public road.

" '4th. It is further my will, that my said beloved wife, have the care and control of my farm on Long Fork Creek of Barren River, located in Macon County, Tenn., using the rents and profits therefrom, for her comfort and support, during her natural life, and if this provision and all heretofore, herein made for her is not suffi-

cient for her comfort and maintenance according to her rank and station in life, then it is my will that my said beloved wife sell and convey first the small tract of 5 acres above described or so much thereof as may be necessary, and if this should prove inadequate, then she will sell and convey, so much only, of the Long Fork farm as is absolutely necessary.

" '5th. I hereby appoint my beloved wife, M. Lula Pipkin as Executrix to this my last will and testament and excuse her from giving bond. This April 19th, 1917.

"M. F. Pipkin.

" 'Signed and declared by the above M. F. Pipkin, to be his last will and testament in the presence of us, who have hereunto signed our names, as witnesses to this will in the presence of the testator. April 19, 1917.

" 'Thomas N. Smith
" 'H. S. Hesson, M. D.'

"Lula Pipkin made her will July 22, 1936, which is as follows:

" 'I, Lula Pipkin being of sound mind and disposing memory, to make and publish this my last will and testament, hereby revoking and making void all former wills by me made.

" 'I desire that as soon after my death as practicable, that all the expenses of my last sickness and burial expenses be paid and all other debts that I may owe at the time of my death if any, out of any money that may be on hand or that may first come into the hands of my executor.

" 'Second. I desire that T. J. Brockett, my nephew have my bedroom suit, consisting of bedstead, dresser and wash stand.

" 'Third. I desire my sister Allice Morgan to have my set of chinaware dishes.

" 'Fourth. I bequeath to Ben E. Brockett, my brother the proceeds of the sale of one-half of the personal property that was on hand at the death of my beloved husband, M. F. Pipkin, that may not be consumed at my death in compliance with the will of my late beloved husband.

" 'Fifthly. I give and bequeath to my brother Ben Brockett, all the remainder of my individual personal property not bequeathed as above bequests.

" 'Sixthly. It is further my will, that Ben E. Brockett, my brother have my home where I now live at Red Boiling Springs, consisting of about five acres of land, with dwelling house and barn, just south of Red Boiling Springs on Carthage State Highway No. 52, to have and to hold for his use and benefit during his natural life and should he so need funds to meet his needs to live, for his comfort and support, then it is my will that he may sell and convey one or two, if needs be, building lots off the South end of the five acre tract now my home.

" 'Seventh. Should Ben E. Brockett die before his wife died, I desire his wife Martha Brockett to have and to hold for her use and support so long as she remains his widow, the place here mentioned as my home, during her widowhood.

" 'Eightly. At the death or remarriage of Martha Brockett if she survive her husband Ben E. Brockett, I desire the five acre home place where I now live to be sold and the proceeds of the sale to be divided equally between my surviving brothers and sisters and my nephew and niece, T. J. Brockett and Evelyn Brockett, all shall share equal.

" 'I hereby appoint my brother Ben E. Brockett as executor to this my last will and testament, without bond.

" 'This July 22, 1936.

" 'Lula Pipkin.

" 'Signed and declared as last will and testament in the presence of us, who have hereto signed our names as witnesses to this will in the presence of testator.

" 'July 22, 1936.

" 'A. R. Meador
" 'H. C. Sabens.'

"From the foregoing will of Lula Pipkin valuable property was given to the complainant, it appearing that the five acre home place in Red Boiling Springs was worth at the time of her death about $2,500. Complainant's life estate in this would amount to approximately $1,100.

"Dr. H. C. Hesson testifies that the services performed by the complainant would be worth the same as a trained nurse, that is $6 or $7 a day and night; that the services he rendered were different from the ordinary patient, in that the deceased's bladder always leaked and he had trouble with an infected prostate gland, and it required a great deal of work to keep him clean and dry.

"Dr. Kirby says that the complainant did more than a trained nurse would have done, and that trained nurses get $7 to $8 a day.

"It further appears from the proof that the pay of a practical nurse averages about $2 a day.

"Considering the entire record, and particularly the amount complainant was making at the time he went to wait on the deceased, and the unusual services rendered, I am of the opinion that a reasonable price per day for such services would be $3. I am of the opinion, however, that complainant cannot recover because his contract, in my opinion cannot be construed as deferring collection or payment for services to M. F. Pipkin, until after the death of his wife, as complainant insists, and, that under the facts, his claim is barred by the statute of limitations, as insisted by defendant. His action accrued when M. F. Pipkin died. The bill was filed in this case on April 11, 1938. Therefore his bill will be dismissed at his

cost. There was no price agreed upon. The services to each can be valued separately. Therefore it was a separable contract, if any.

"This finding will be filed as part of the record and decree drafted accordingly, and entered on the Chambers Minutes of the Court, and the complainant will be granted 30 days in which to perfect appeal, and 60 days to file bill of exceptions.

"The Clerk & Master will notify counsel of the receipt of this opinion and finding of facts.

"Done at Livingston, Tennessee, this October 11, 1939.

"A. F. Officer, Chancellor."

The appellant's assignments of error are as follows:

1. "The Court erred in dismissing the bill and taxing the complainant and sureties on his prosecution bond with costs of the cause."

2. "The Court erred in failing and refusing to decree to complainant reasonable compensation for his services."

3. "The Court erred in holding the contract a separable and not an entire contract."

4. "The Court erred in holding that the claim for compensation under the contract is barred by the Statute of Limitations."

Before the case was submitted to this Court, the appellee, through his solicitor of record, filed a motion, in writing, "that appellant's four assignments of error be stricken for nonconformity to subsection 2 of Rule 11 of this Court."

With respect to the first and second assignments of error, supra, the motion to strike is sustained. The first and second assignments are too general and indefinite to merit consideration under the Rules of this Court which require that assignments of error shall show specifically wherein the action complained of is erroneous. See Rules, Williams' Annotated Code, vol. 7, page 546; 2 Ency. Pl. & Pr., page 953; Grundy County v. Tennessee Coal, etc., Co., 94 Tenn., 295, 298, 303, 29 S. W., 116; Stone v. Stonecipher, 7 Tenn. App., 614, 617; Elbinger Shoe Co. v. Thomas, 1 Tenn. App., 161, 162, 163; Thurman v. Bradford, 3 Tenn. Civ. App., 474, 475; Adamant Stone & Roofing Co. v. Vaughn, 7 Tenn. App., 170, 173; Memphis v. Byrne, 9 Tenn. App., 379, 382; Taylor v. Taylor, 14 Tenn. App., 101, 120, 121; Pollard v. Beene, 20 Tenn. App., 83, 88, 95 S. W. (2d) 943.

The third and fourth assignments of error, supra, are meager, but when considered in connection with the appellant's statement of the case, brief and written argument, we think they may be treated as a sufficient compliance with the Rules to justify their consideration as assignments of error. See Nashville Gas & Heating Co. v. Phillips, 17 Tenn. App., 648, 672, 69 S. W. (2d), 914, and other cases there cited; Nashville Trust Co. v. Williams, 15 Tenn. App., 445, 449.

It is apparent from a consideration of the Chancellor's findings and decree and the appellant's third and fourth assignments of

error that the determinative question for decision here is whether the contract in controversy was entire or divisible, for if it was a divisible, or severable, contract, the Chancellor did not err in holding that complainant's action was barred by the Statute of Limitations.

"Where a contract is severable or divisible, breaches of its severable parts will give rise to separate causes of action accruing at different times, so that the Statute of Limitations will begin to run at the time of each severable breach, although not until then." 37 C. J., page 854, sec. 216.

In 12 American Jurisprudence, pages 870, 871, sec. 315, it is said that: "No formula has been devised which furnishes a test for determining in all cases what contracts are severable and what are entire. The primary criterion for determining the question is the intention of the parties as determined by a fair construction of the terms and provisions of the contract itself, by the subject-matter to which it has reference, and by the circumstances of the particular transaction giving rise to the question."

And in Sections 316 and 317, on pages 871-873 of the same volume, it is said in Section 316 that:

"As a means of ascertaining the intention of the parties, various tests have been adopted. According to some authorities, the criterion is to be found in the question whether the quantity, service, or thing as a whole is of the essence of the contract. If it appears that it is to be performed only as a whole, the contract is entire. As a general rule, a contract is entire when, by its terms, nature, and purpose, it contemplates that each and all of its parts are interdependent and common to one another and to the consideration, and is severable when, in its nature and purpose, it is susceptible of division and apportionment.

"Another test that has been suggested is the possibility or impossibility of a certain apportionment of benefits, according to the compensation in the contract, in case of part performance only."

And in Section 317 it is said: "The singleness or apportionability of the consideration appears to be the principal test. If the consideration is single, the contract is entire; but if the consideration is expressly or by necessary implication apportioned, the contract is severable. The question is ordinarily determined by inquiring whether the contract embraces one or more subject matters, whether the obligation is due at the same time to the same person, and whether the consideration is entire or apportioned. If the consideration to be paid is single and entire, the contract must be held to be entire, although the subject thereof may consist of several distinct and wholly independent items. The principle by which the courts are governed when they declare that a contract about several things but with a single consideration in gross is entire and not severable is that it is impossible to affirm that the party making the contract would have

consented to do so unless he had supposed that the rights to be acquired thereunder would extend to all the things in question."

The principles thus clearly stated in American Jurisprudence are, in substance and effect, stated more elaborately in 6 Ruling Case Law, page 858-860, and in 17 C. J. S., Contracts, pages 785-791, secs. 331, 332, 333, 334, 335, 336.

In the above cited text from Ruling Case Law, it is said, among other things, that: "As a means of ascertaining the intention of the parties, various tests have been adopted. According to some authorities, the criterion is to be found in the question whether the whole quantity, service or thing—all as a whole—is of the essence of the contract. If it appears that the contract is to take the whole or none, the contract is entire. Another test that has been suggested is the possibility or impossibility of a certain apportionment of the benefits, according to the compensation in the contract, in case of part performance only. The singleness or apportionability of the consideration appears, however, to be the principal test. If the consideration is single, the contract is entire; but if the consideration is expressly or by necessary implication apportioned, the contract is severable. The question is ordinarily determined by inquiring whether the contract embraces one or more subject-matters, whether the obligation is due at the same time to the same person, and whether the consideration is entire or apportioned."

The principle stated in the above texts, that where the consideration of a contract is susceptible of apportionment, the contract is severable, has been approved by our Supreme Court. The last reported opinion of the Courts of this State dealing with this subject to which our attention has been directed is in the case of Bradford & Carson v. Furniture Co., 115 Tenn., 610, 627, 92 S. W., 1104, 1109, 9 L. R. A. (N. S.), 979, wherein the Court said:

"In the case of Coleman v. Hudson, 34 Tenn. (2 Sneed), 463, 465, Judge McKinney speaking for the court says:

"'The distinction between an entire and severable contract is clearly stated in the books. In the former the consideration is entire on both sides. It does not, either by its terms or the implied intention of the parties, contemplate or admit of apportionment upon a partial failure on either side; and the complete fulfillment of the contract by either is required as a condition precedent to the fulfillment of any part of the contract by the other. A severable contract is a contract, the consideration of which by its terms is susceptible of division and apportionment. There is, in such contract, no entirety of consideration on either side constituting a condition of the agreement; and neither party can claim more than an equivalent for the actual consideration on his part. Story on Con., secs. 21, 22.

"'An entire contract in its legal interpretation is an unconditional agreement for the whole of the several articles, or number or quan-

tity of goods contracted for; and precludes by its terms, and equally by the plain intention of the parties, all idea of divisibility. A severable contract on the other hand in its terms implies an apportionment.'

" 'There is another class of cases noticed in some of the books of a mixed nature partaking of the character both of entire and severable contracts, and which may be considered as entire or severable according to the circumstances of the particular cases.' "

Assuming, as the Chancellor found, that complainant promised M. F. Pipkin, at his (Pipkin's) request, that he would remain with and serve him until his (M. F. Pipkin's) death, and would remain with and serve his widow until her death, it is, we think, obvious that the consideration for the services to be rendered M. F. Pipkin in his lifetime and the services to be rendered to the latter's widow are *apportionable*. The act of complainant in waiving all claims to compensation for services to the widow and claiming compensation for services to M. F. Pipkin in his lifetime alone, is a tacit recognition of this fact. There is nothing in the record which suggests that the services rendered by the complainant to the widow would merit the same rate of compensation as the services rendered to M. F. Pipkin before his death.

We find nothing in the record which so much as suggests that M. F. Pipkin intended, or had in mind, that any services which complainant might render to his widow after his death should be a charge against his estate. All the services for which complainant is seeking compensation were rendered during the "last sickness" of M. F. Pipkin, and the last will of the latter which, although executed prior to the rendition of complainant's services, spoke from the death of the testator, directed that "as soon after my death as practicable, that all of the expenses of my last sickness and burial expenses be paid," and that "all other debts that I may owe at that time, if any, out of any money that may be on hand or that first come into the hands of my executrix;" and he made his entire estate subject to the necessities of his widow "for her comfort and support during her natural life," and, in effect, gave her the power to sell and dispose of as much thereof as might be necessary for that purpose, even to the whole estate.

Without further discussion, we are content to hold, as decreed by the Chancellor, that "the complainant's cause of action against the estate of M. F. Pipkin for services rendered the deceased during his lifetime accrued upon the death of the said M. F. Pipkin, which occurred on May 19, 1925 and that complainant's bill herein having been filed on April 11, 1938, the defense of the Statute of Limitations set up and interposed by the defendant to complainant's cause of action is good, and constitutes a bar to complainant's suit."

It results that the appellant's assignments of error are overruled and the decree of the Chancery Court dismissing complainant's bill

and adjudging that the complainant and his sureties on his cost bond pay the costs of the cause is affirmed.

The costs of the appeal will be adjudged against the appellant and the sureties on his appeal bond.

Crownover and Felts, JJ., concur.