# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

FILED

December 2, 1998

Cecil W. Crowson
Appellate Court Clerk

ROGER P. HOGAN, FRED C. DANCE, )
and MUSIC CITY DUST-TEX )
SERVICE, INC., )
                    )
      Plaintiffs/Appellants, )
                    )
                    )
VS. )
                    )
                    )
COYNE INTERNATIONAL )
ENTERPRISES CORPORATION )
d/b/a COYNE TEXTILE SERVICES, )
                    )
      Defendant/Appellee. )

Appeal No.
01-A-01-9712-CH-00733

Davidson Chancery
No. 95-2911-III

APPEALED FROM THE CHANCERY COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE ELLEN HOBBS LYLE, CHANCELLOR

HELEN S. ROGERS
2205 State Street
Nashville, Tennessee 37203
      Attorney for Plaintiffs/Appellants

C.J. GIDEON, JR.
WILLIAM S. WALTON
414 Union Street
Suite 1900, NationsBank Plaza
Nashville, Tennessee 37219-1782
      Attorneys for Defendant/Appellee

AFFIRMED IN PART; REVERSED IN PART;
MODIFIED AND REMANDED

BEN H. CANTRELL
PRESIDING JUDGE, M.S.

CONCUR:
KOCH, J.
CAIN, J.

# O P I N I O N

This action is based on a series of contracts executed in the sale of an industrial dust control and laundry business. The Chancery Court of Davidson County dismissed the claims of the sellers, held that one of the sellers had breached one of the agreements but that the buyer had failed to prove its damages, and awarded the buyer attorneys' fees. We reverse the dismissal of the sellers' action and modify the award of attorneys' fees.

## I.

Roger P. Hogan owned seventy-five percent of Music City Dust-Tex Service, Inc. (Dust-Tex), a Nashville industrial laundry business; Fred Dance, a Nashville attorney, owned the other twenty-five percent. Hogan owned the building that housed the operation. Dust-Tex rented to its customers dust control products such as mats, dust mops, wet mops, aprons, bar towels, table linens, and napkins. In addition, Dust-Tex cleaned some of the goods that actually belonged to its customers. (These services were referred to in the record as "N.O.G.", meaning "not our goods.")

In the fall of 1993, Mr. Hogan and Mr. Dance met with the president and vice-president of Coyne International Enterprises Corporation, a national industrial laundry business, to discuss the terms of a sale of Dust-Tex to Coyne. The negotiations led to a series of agreements on December 28, 1993 in which Coyne agreed to purchase the assets of Dust-Tex, including the trade name, the goodwill, and the customer contracts. In separate agreements, Coyne hired Hogan as the general manager of the Nashville operation, and leased the building from him. Hogan and Dance executed a negative covenant agreement in which they agreed to refrain from competing with Coyne in the industrial laundry business, or from assisting any others in such competition. Hogan signed a similar negative covenant agreement on behalf of Dust-Tex.

Coyne agreed to pay the sellers $552,500. Although the sellers quoted a lump sum price based on $85 per dollar of weekly rental business, Coyne got the sellers to agree at the closing to allocate the sales price in the following manner.

| | | Payable to | Date Due |
|---|---|---|---|
| Laundry Equipment, Office: Furniture, etc. | $ 32,500 | corp. | July 1, 1994 |
| Merchandise Inventory: Supplies, etc. | $100,000 | corp. | Dec. 31, 1993 |
| Building Rent: $2,000 per month x 60 months | $120,000 | Roger Hogan | monthly starting Jan. 1, 1994 |
| Sales Commission: | $175,000 | Roger Hogan | $17,500 Apr. 1 and Oct. 1, 10 payments starting Apr. 1, 1994 |
| Consulting & Neg. Covenant: | $125,000 | jointly Roger Hogan & Fred Dance | $12,500 Apr. 1 and Oct. 1, 10 payments starting Apr. 1, 1994 |
| | $552,500 | | |

Within four months of the purchase, Coyne moved the cleaning and processing operation to London, Kentucky. Hogan had to terminate his sales people and pick up the duties of a salesman and route person. He viewed this change as a demotion from the position of general manager, and he experienced a drop in efficiency because of the problem of getting the goods back from Kentucky. In the Spring of 1995, Hogan went on sick leave for surgery. After the surgery, he did not return to work, and he filed suit against Coyne for a breach of the employment agreement in September of 1995.

Coyne paid the $100,000 down payment, the $32,500 on July 1, 1994, and the installment payments through April of 1995. Coyne also tendered the October 1995 payments but stopped payment on the checks when Hogan sued Coyne over

his employment agreement. When Coyne refused to make the payments called for in the purchase agreement, Hogan, Dance, and Dust-Tex sued to collect the remaining payments. Coyne counterclaimed for damages, alleging that the plaintiffs breached the agreement and that they were guilty of fraudulent misrepresentations. Coyne continued to make the lease payments through August of 1996, when they moved out, alleging the building was unsafe and had not been repaired by Hogan.

## II.

## The Sales Agreement

The contract of sale includes several parts. The principal part is a letter from Coyne dated December 28, 1993 in which Coyne confirms an agreement to purchase the assets, inventory, goodwill, customer contracts, and the Dust-Tex trade name. Hogan and Dance warranted that the Dust-Tex rental volume amounted to $6,336 per week and the N.O.G. volume amounted to $465 per week. The two figures were to be verified in a four week test period in January of 1994, and if the volume fell below the warranted figures, the purchase price would be reduced by $85 for every one dollar of rental volume below $6,336 per week and $30 for every N.O.G. dollar below $465 per week.

Coyne signed two purchase orders. One covered the inventory and supplies ($100,000) and the other the laundry equipment and office furniture ($32,500). Another sheet attached to the letter agreement called for payments to Hogan for "sales commissions" of $175,000 in ten installments of $17,500 each due on April 1 and October 1 beginning in 1994. The final attachment called for payments to Hogan and Dance jointly for "Consulting and Agreement Not to Compete" of $125,000, payable in ten installments on the same schedule as the installment payments to Hogan. Coyne also bargained for the right to designate $120,000 of the purchase price as "building rent," consisting of $2,000 per month for sixty months.

(The building was actually owned by Hogan, and was leased by Coyne in a separate lease.)

When Coyne stopped payment on the checks issued to Hogan and Dance for the October 1, 1995 installment, Hogan and Dance filed an action for breach of contract. Coyne did not plead an affirmative defense to the contract action; instead Coyne filed a counter-claim based on (1) a breach of the restrictive covenant in Hogan's employment agreement, (2) Hogan's failure to perform his duties under the employment agreement, (3) fraudulent misrepresentations concerning the volume of Dust-Tex's business, and (4) a violation of the negative covenants signed by Hogan and Dance. Coyne asked for rescission and restitution, damages, and a declaration that it had no further obligations under the agreement to purchase Dust-Tex or under the lease agreement with Hogan. In an amendment to its counterclaim, Coyne alleged that the plaintiffs had induced a breach of Coyne's contract with its customers.

The chancellor dismissed the fraud claims, citing a lack of proof of any misrepresentations by Hogan or Dance. (The proof shows that the figures warranted in the contract checked out in the 1994 test period -- although Coyne alleged that the test period billings were inflated.) On the negative covenants, the chancellor found that Dance had not breached the agreement but that Hogan had committed a breach by being involved in a company known as Dust-Tex Mat and Mop. As to any damages suffered by Coyne, the court found that Coyne's losses were attributable to its own "poor service to its customers, including rudeness, forgery and shortages."

The chancellor refused to rescind the agreement because the parties could not be placed in status quo. The court dismissed Coyne's damage claims, but held that Coyne had no further obligation to make the installment payments on the purchase price.

Hogan and Dance allege that the chancellor erred in holding that Coyne had no further obligation on the asset purchase agreement. We agree. Although we agree with the chancellor's findings of fact, the findings do not support a cancellation of the balance of the contract.

A contract may have several parts. A breach of one part will excuse all of the promised performance by the other party where the contract is to be performed only as a whole. *Brockett v. Pipkin*, 149 S.W.2d 478, 483 (Tenn. App. 1941). In such a case, we call the contract "entire," and "the complete fulfillment of the contract by either side is required as a condition precedent to the fulfillment of any part of the contract by the other." *Bradford & Carson v. Montgomery Furniture Co.*, 92 S.W. 1104 at 1109 (Tenn. 1906).

If, however, "several things are to be done under a contract, and the money consideration to be paid is apportioned to each of the items, the contract is ordinarily regarded as severable." 17A Am.Jur.2d *Contracts* § 418. In that case, "neither party can claim more than an equivalent for the actual consideration on his part." *Bradford and Carson v. Montgomery Furniture Co.*, 92 S.W. 1104 at 1109 (Tenn. 1906).

In this case, Coyne specifically assigned a money value to the separate parts of the agreement. We think it is clear that the contract was severable, and a breach of one part would not excuse the promised performance for the other parts. It should be obvious therefore that Mr. Hogan's breach of the negative covenant or his breach of his separate employment agreement would not defeat Dance's right to recover what was promised to him. Coyne received full performance from Dance and should deliver what was promised in return.

What about Hogan? There is another level of severability that has been applied by our courts. That is severability within a specific part of a contract.[1] The point is best illustrated by *Bradford and Carson v. Montgomery, supra*, where the sellers sold their furniture business and entered into a covenant not to engage in the furniture business for a period of three years. The parties valued the goodwill of the business and the covenant not to compete at $3,000 and the purchaser gave the sellers a note for that amount, due in one year. The sellers breached the covenant not to compete within a year, but the Supreme Court held that the sellers could collect the note. The court recognized that the buyers did have a claim for the amount they had been damaged by the sellers' breach, but the buyers had the burden of proving the amount of their damages. The Court reasoned that the note covered two different things and that the buyers "have received by far the larger part of the consideration of their note, the good will of the firm of Bradford and Carson, and the performance of their contract to close business for nearly one-third of the time agreed upon." 92 S.W. at 1110. The performance of the contract not to re-enter the furniture business was therefore not a condition precedent to collecting the note.

This court reached a similar result in *Young v. Jones*, 255 S.W.2d 703 (Tenn. App. 1952), where the plaintiff sold his veterinary business for $10,000 and agreed not to practice veterinary medicine "for as long as the contract was not breached" (by the buyer, we assume). The purchase price was to be paid in monthly installments of $166.67. When the seller resumed a veterinary practice, the buyer asked for a cancellation of the upaid purchase price. Relying on *Bradford and Carson v. Montgomery*, this court held that the contract was severable and that performance by either party was not subject to performance by the other as a condition precedent. To demonstrate the independence of the covenant and the promise to pay the purchase price the court said:

---

[1] Although the courts have talked in terms of severability in these cases, the more precise terms are dependent vs. independent promises or conditions. *See* Am. Jur. 2d *Contracts* § 473.

The only difference in those facts and the instant case is the covenant not to compete was to run for the rest of Jones' life and the price was to be paid in installments over approximately a five year period. It is obvious that, if Jones lived longer than five years, the price would have been applied before he could fully perform, and if Jones had died, say the first year, the purchaser was not bound to perform fully for five years in paying the note; immediate performance by neither was expected, nor was performance of one dependent upon performance by the other of these parts of the contract.

255 S.W.2d at 706.

The order of time in which promises are to be performed may control whether they are independent of dependent. "[W]here the acts to be done are to be done at different times the stipulations are to be construed as independent of each other." 17 Am. Jur. 2d *Contracts* § 474. In this case Coyne was obligated to pay the balance of the purchase price over five years. The negative covenants signed by Hogan and Dance included a five year provision (not to engage in or assist another in engaging in the industrial laundry business) and a ten year provision (not to solicit Coyne's customers or any Dust-Tex employees hired by Coyne). Although the chancellor held that the ten year provision was unreasonable (and therefore unenforceable beyond five years) the contract demonstrates that payment was not conditioned on performance by the sellers. Coyne could set off against the purchase price any damages it suffered from the sellers' breach, but Coyne had the burden of proof. The chancellor found that Coyne had failed to carry that burden and Coyne has not taken issue with that determination on appeal. We have examined the record and we are satisfied that there is no proof on which to base a judgment for damages for a breach of the negative covenant. Coyne, therefore, remains obligated to pay the balance of the purchase price, except for the balance due on the lease payments. We will deal with that part of the case in Part IV of this opinion.

One other thing remains to be said about this part of the controversy. The breakdown of the contract into its several parts was Coyne's own invention -- for

tax purposes, apparently. The reference to "commissions" in Hogan's payments and "consulting" in the payments to Hogan and Dance were merely Coyne's labels, and not an indication of specific services that were actually due from Hogan and Dance. Hogan was not due any commissions under the sales agreement. He had a separate employment agreement under which he could earn a bonus if the company achieved a certain sales level, but there is no proof in the record of how he was to earn the $175,000 Coyne was to pay him over five years. The same is true of the "consulting" services for Dance. There is no proof of any duties he had in that regard. We therefore conclude that the separate categories were just for Coyne's convenience in accounting for the purchase price.

The sellers should be allowed to recover the balance of the $175,000 due to Hogan and the $125,000 due to Hogan and Dance jointly.

III.

**Hogan's Employment Agreement**

Hogan sued Coyne for a breach of his separate employment agreement. He alleged that he was employed as a general manager of the Nashville plant, but that he was reduced to the position of a route salesman. He was not consulted on long range planning or corporate policy decisions, and he did not receive any special instructions or proprietary information on pricing, customer relations, or adjusting complaints.

The chancellor found that Hogan abandoned his job with Coyne and breached the employment agreement by acting contrary to Coyne's interests and engaging in other employment.

We agree with the chancellor's findings and conclusion in this respect. First, the agreement did not define the duties of a general manager, but it did provide that Hogan would "carry out and perform such duties as may be assigned by employer's president, its chairman of the board or its vice president." Coyne was free to make the business decision to move most of the operations to London, Kentucky and to redirect Hogan's activities in light of that decision. But Coyne continued to pay Hogan his full salary. Therefore, Coyne did not breach the employment agreement or constructively discharge Hogan.

In the spring of 1995 Hogan went on sick leave for surgery. He did not return to work for Coyne, and he filed an action for the breach of his agreement in September of 1995. Since we concur in the chancellor's findings and conclusions regarding the alleged breach by Coyne, we also agree with her conclusion that Hogan voluntarily abandoned his employment contract.

## IV.

## The Lease

When Coyne acquired Dust-Tex in December of 1993, it also entered into a five year lease of the space owned by Hogan, that formerly served as the base of Dust-Tex's operations. The lease stipulated that the premises were received in good order and condition. It also included a provision that Coyne would maintain the premises in good order and make all necessary repairs except for pre-existing and structural conditions.

The proof showed that in 1996 the roof leaked to such an extent that Coyne employed a roofing expert to assess the problem. The expert concluded that the leaks made the building unsafe and that the deficiencies in that respect existed

prior to December of 1993. Coyne called on Hogan to make the necessary repairs, but Hogan refused to do so. On July 23, 1996 Coyne vacated the building.

The chancellor found that "the premises were not in good order and condition upon receipt by Coyne and that the problems which required Coyne to vacate the premises were pre-existing."

Hogan maintains that the proof showing the defective roof was a pre-existing condition violated the parol evidence rule; it contradicted the lease provision that the premises were received in good order and condition. It should be noted, however, that the two lease provisions should be read together. The provision imposing on the tenant a duty to make repairs "except for pre-existing conditions, and structural repairs" indicates that the parties knew such things might exist. Therefore, parol evidence that the roof was defective on the date of the lease would not vary or contradict the contract.

We think the chancellor's findings are supported by the proof. Therefore, the building condition amounted to a constructive eviction.

With respect to the lease payments of $2,000 per month mentioned in the sales agreement, Hogan argues that the true rent was $4,500 per month and that the $2,000 payment was actually part of the purchase price. In effect, Hogan argues that the reference to rent in the sales agreement was just another of Coyne's slick accounting practices.

We note, however, that the lease actually recites that $6,500 per month will be paid for forty-eight months and that $2,000 per month will be paid for an additional twelve months. If Mr. Hogan is correct it means that in the fifth year Coyne would be occupying the building rent-free. The issue is not free from doubt, so we will

accept Coyne's argument that the $2,000 monthly payments in the sales agreement actually represented rent.  Therefore, the chancellor's finding that Hogan breached the lease is a defense to any further claim for the $2,000 lease payments.

## V.

## The Negative Covenants

Hogan asserts that the restrictive covenant in his employment agreement and the negative covenant he and Dance signed are void because they are used to restrain ordinary competition.

The employment contract contained the following provision:

1)      Employee agrees that, for a period of three (3) years from the date of termination of his employment, regardless of the cause of that termination, he will not directly or indirectly, engage in, re-engage in, conduct, operate, or assist any person, partnership, corporation or other entity as an officer, director, partner, consultant, employee, or otherwise, in the industrial laundry business nor will he do industrial laundry for sale or rental by anyone else.  The covenant contained in this paragraph applies to all of the geographic area within seventy (70) miles of Nashville, Tennessee.

2)      Employee further agrees that, for a period of ten (10) years from the termination of his employment, regardless of the cause of that termination, he will not call upon or cause to be called upon, or assist in the solicitation of industrial laundry business from any person, partnership, corporation or other entity served by Coyne from any location during Employee's employment or with whom the Employee became acquainted while in the Employer's employ or whose name and/or addresses were furnished to him by Employer or procured by Employee while in said employ and that he will not furnish in writing or otherwise or disclose in any conversation, directly or indirectly, any of said names and/or addresses or any other information concerning these persons, partnerships, corporations or other entities or agencies, to any person, partnerships, corporations or other entities or agencies, to any person, partnership, corporation or other entity.

3)      These covenants will also apply to any new location to which Employee may be transferred during Employee's employment.

4) Employee also agrees that for a period of three (3) years from the termination of his employment, <u>regardless of the cause of that termination</u>, he will not solicit or attempt to solicit or otherwise attempt to cause Coyne employees to leave their employment.

The negative covenant signed by Hogan and Dance provided:

a) Except for any employment with CTS, Covenantors will, within the territory set forth in Exhibit C, immediately cease all their activities in the industrial laundry business and will withdraw their business connections and services of every kind and nature in any way connected with the industrial laundry business in any of its phases, which includes, but is not limited to, the rental of such items as work clothes, shop towels, wiping cloths, coats, pants, jackets, coveralls, frocks, smocks, work gloves, fender covers, dust control equipment and supplies, glass towels, caps, roll towels, dust bags, protective garments, reusable absorbents and other similar items and any other items rented by Dust-Tex or CTS. This restriction shall apply for a period of three (3) years from the date hereof.

b) Covenantors agree that for a period of five (5) years, they will not, within the territory set forth in Exhibit A, reengage in, conduct, operate or assist another as a lender of money, shareholder, consultant, agent, employee, or otherwise in the industrial laundry business, nor will they do industrial laundry for sale or rental by anyone else.

c) Covenantors agree that for a period of ten (10) years they will not cause to be called upon or assist in the solicitation of business from, any customer purchased by CTS (the "Customers"). Covenantors shall not at any time disclose in any manner any Proprietary Information relating to the Customers including, but not limited to, any of the names and/or addresses of these Customers or any other information concerning the names and/or addresses of these Customers to any other person, partnership, firm, corporation or agency. Covenantors further agree that they will not at any time or in any way interfere with or impede the business being purchased by CTS and that they will not at any time solicit, directly or indirectly, any of the Dust-Tex employees hired by CTS.

Our Supreme Court has said that such covenants are enforceable "if they are reasonable under the particular circumstances." *Hasty v. Rent-a-Driver, Inc.*, 671 S.W.2d 471 at 472 (Tenn. 1984). "Reasonableness" includes a time and

geographical component. *Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28 at 33 (Tenn. 1984). But it also includes a requirement that the restraint imposed must not exceed what is needed to protect the employer's legitimate interests. *Selox, Inc. v. Ford*, 675 S.W.2d 474 at 475 (Tenn. 1984). The employer's legitimate interests do not include a restraint on "ordinary" competition. *Hasty v. Rent-a-Driver, Inc.*, 671 S.W.2d 471 (Tenn. 1984). But it is reasonable for an employer to restrict a former employee's contact with the employer's customers where customers tend to associate the employer's business with the employee. *Id.* at 473. Outside the employer/employee relationship, covenants restricting competition have generally been upheld when they are incidental to the sale of a business. *Green Co. Tire Co. v. Sparlin*, 338 S.W.2d 597 (Tenn. 1960); *Butts v. Birdwell*, 503 S.W.2d 930 (Tenn. 1973).

We think Coyne had a legitimate business interest to protect by putting Hogan under a non-compete agreement. Hogan <u>was</u> the business in this area, and he agreed to the restrictions in connection with the sale. He posed more than an ordinary threat of competition to Coyne. On appeal, Hogan argues at length that the proof shows he did not personally cause any of Coyne's customers to take their business elsewhere. Therefore, he argues, he was not closely associated with the business in the customer's minds. The reasonableness of the restriction, however, must be measured as of the time of the agreement. *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2D 361 (Tenn. 1966).

As to the time restrictions, Hogan does not argue on appeal that the agreements were <u>per se</u> invalid. While a ten year restriction might be unreasonable, the court has the option to refuse to enforce a restriction beyond a reasonable time or outside a reasonable area. *Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28 (Tenn. 1984). Since the chancellor held that the negative covenants would not be

enforced beyond a three year period, the problem with the length of the restriction has now become moot.

## VI.

## Attorneys' Fees

The chancellor awarded Coyne $65,000 in attorneys' fees against Hogan. On appeal Hogan argues that the fees were not justified by the negative covenant agreement nor by the proof in this case.

The American Rule prohibits an award of attorney's fees as a part of the costs of litigation except where the award is provided by statute or contract. *Goings v. Aetna Casualty and Surety Company*, 491 S.W.2d 847 (Tenn. App. 1972). In this case the Negative Covenant agreement signed by Hogan provided:

> In the event of a breach of this Agreement, the party enforcing the Agreement shall be entitled to reasonable attorneys' fees and reasonable costs and expenses associated with the enforcement thereof.

The trial court held a hearing on the attorneys' fees issue. The only proof on the amount was contained in the records kept by Coyne's lawyers, one firm in Nashville and another in New York. The records detailed the time and expenses spent on the series of cases consolidated for trial, but the records do not break down the costs incurred in defending or enforcing the negative covenant. The total fees and expenses for the two firms came to $129,388.52. There is no dispute over the reasonableness of the hourly rates charged or the total hours spent in the litigation.

The sole question here, then, is how much of the overall fee should be apportioned to the controversy over Hogan's breach of the Negative Covenant. There were actually three actions consolidated for trial. The first was an action by Hogan

alleging a breach of his employment agreement. Coyne filed a counterclaim against Hogan, Dance and Dust-Tex, alleging a violation of the negative covenant by Hogan and Dance, a breach of the employment contract, and fraud on the part of all of the counter-defendants. The second action was filed by Hogan, Dance, and Dust-Tex for a breach of the asset purchase agreement. Coyne filed a counterclaim, essentially raising the same issues that were raised in the prior action. In addition, Coyne alleged in the counterclaim that it was no longer obligated on the lease. Hogan joined issue on that allegation. The third action was an appeal of a General Sessions action in which Hogan and Dance sought to repossess the equipment transferred to Coyne in the sale.

As we have indicated, the only provision for the recovery of attorneys' fees is in the Negative Covenant. A major part of the whole controversy involved other matters -- the fraud claims, the allegation that Dance violated the Negative Covenant, the lease, and Hogan's employment agreement. While we acknowledge that Hogan's Negative Covenant played a part in all of the claims, we are satisfied that allocating almost one-half of the total fees and expenses to that items alone results in an unreasonable fee for its enforcement or defense. We are handicapped, as the trial court was, by the refusal of Coyne's attorneys to make any allocation on their own. In fact, the summaries in the record delete all references to the specific activities for which the charges were made. If the specifics are to be kept secret, some other method could have been employed to give a better approximation of the time devoted to the Negative Covenant.

Based on our review of the record, we think one-fourth of the expense should be allocated to the enforcement of the Negative Covenant. We, therefore, modify the judgment against Hogan for attorneys' fees to $32,347.13.

The judgment of the court below is reversed in part, and modified in part, as indicated herein. In all other respects it is affirmed. The cause is remanded to the Chancery Court of Davidson County for the entry of a judgment in accordance with this opinion. Pre-judgment interest on the award to Hogan and Dance for the breach of the asset purchase agreement in the amount of 10% per annum shall run from the dates the installment payments came due. Post-judgment interest on Coyne's

$32,347.13 judgment against Hogan shall run from November 17, 1997, the date of the final judgment below. Tax the costs on appeal equally to Hogan and Coyne.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.

CONCUR:

_____
WILLIAM C. KOCH, JR., JUDGE

_____
WILLIAM B. CAIN, JUDGE