IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 8, 1999 Session

# VIRNIE M. FULKS v. J. HULAN WATSON, SUPERINTENDENT OF SCHOOLS, ET AL.

**Appeal from the Chancery Court for Rutherford County**
**No. 97CV-1362      Don R. Ash, Chancellor**

---

**No. M1999-02800-COA-R3-CV - Filed June 18, 2001**

---

This declaratory judgment action was filed by a dissatisfied school system employee who was transferred from his position as Manager of Property, Plant, and Maintenance to the position of maintenance worker and ultimately was informed that he would not be rehired. The employee claimed these employment actions were improper because he was tenured and certified. He also sought additional compensation or compensatory time for extra hours he worked. The trial court determined that the employee was not tenured, could be transferred, and was entitled to only a limited amount of compensatory time. The court also found that the superintendent had authority not to renew the employment with proper notice, but that sufficient notice of nonrenewal had not been provided. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J, M.S. and WILLIAM C. KOCH, Jr., J., joined.

Robert L. Huskey, Manchester, Tennessee, for the appellant, Virnie M. Fulks.

George H. Rieger, II, Nashville, Tennessee, for the appellees, J. Hulan Watson, Superintendent of Schools and the Rutherford County Board of Education.

**OPINION**

Virnie M. Fulks, the former Property, Plant, and Maintenance Manager for the Rutherford County School System filed this action after he was transferred to the position of maintenance worker and then informed that he would not be rehired when his contract expired. He sought a declaratory judgment holding that because he was a certified, tenured employee, the Superintendent and the Board of Education lacked the authority to demote or discharge him. He also sought compensation or compensatory time ("comp time") for additional hours he accrued over his regular

forty hour work week.

Employees of the Rutherford County School System were divided into two groups: certified and classified. Certified employees were required to maintain a valid state license to hold their positions. Classified employees were not.[1] Teachers, principals, and guidance counselors held certified positions. Food service workers, maintenance workers, and their supervisors held classified positions. Certified employees were entitled to be notified by April 15 of each year if they were not going to be rehired the following year. Classified employees were hired for one-year terms of employment. They were entitled to fifteen (15) days' notice of non-renewal of their contract before the end of the contract period. *See* Tenn. Code Ann. § 49-2-301(f)(32).

The Rutherford County Board of Education hired Virnie M. Fulks in January 1991 as Property, Plant, and Maintenance Manager, a newly created position. Mr. Fulks was initially hired as a classified employee in a classified, salaried position. The notice announcing the open position did not list a teaching or other license as a requirement for the position. The application Mr. Fulks completed was titled "Classified Employment Application." He had been trained as a shop teacher, but his certification had lapsed at the time the Board hired him. On June 4, 1993, the then-superintendent, Mr. Carlton, forwarded to the finance director a memorandum he had written in October of 1992, but which had apparently been misplaced, regarding a salary adjustment for Mr. Fulks since he had regained his teaching license. In pertinent part, that memo stated:

> He [Mr. Fulks] was hired as a degreed person but found his certification had expired. He then went back and completed course work for certification and should be changed as everyone else when they earn advanced degrees, etc. Please proceed with Payroll Change Form and place him as a certified employee effective 7-1-92.

In the spring of every year, the Rutherford County Board of Education was presented with a list of personnel recommended for rehire for the next year. Consideration of recommendations for non-certified, or classified, personnel was apparently usually done at a June meeting.[2] A memo dated July 9, 1991 to the Board, provided in accordance with Board policy requiring the superintendent to "recommend non-certified personnel for election or reelection by the Board," included Mr. Fulks in a group described as noncertified supervisors. On the rehire list for school year 1992-93, Mr. Fulks was listed on the classified employee list, as one of a group of central office classified supervisors. His name appeared again on the rehire list for classified employees for school year 1993-94.

---

[1] Board of Education policy defined non-certified/classified staff members as "personnel whose regular employment status does not require certification in accordance with rules and regulations of the State Department of Education."

[2] After 1992's Education Improvement Act, these lists must be considered as advisory only, because that Act gave exclusive authority to hire or not renew employment of personnel, except for tenured or tenure-eligible teachers, to the superintendent. *See* Tenn. Code Ann. § 49-2-310(f)(1)(EE).

2

However, for the school year 1994-95, Mr. Fulks's name was listed with certified personnel recommended for rehire, and at a meeting on April 7, 1994, the Board voted to "approve the reemployment and termination of certified employees as presented. The list will be part of the permanent minutes." However, for the school year 1995-96, Mr. Fulks was included on the Classified Rehire List, again listed with a group called "Central Office Supervisors."

On July 1, 1997, Defendant Watson was appointed superintendent. He had previously been a principal in the school system. As a principal, he had become acquainted with Mr. Fulks and, during the intervening years, had become dissatisfied with his performance. When he became superintendent, Mr. Watson decided to replace Mr. Fulks as Property, Plant and Maintenance Manager. By letter dated July 28,1997, Mr. Fulks was informed that "the Superintendent approved on July 18, 1997, your transfer from your position as Property, Plant & Maintenance Manager to a position as a Maintenance Worker in the Maintenance Department effective July 15, 1997." Although Mr. Fulks still received the same salary, he was removed from any supervisory responsibilities and was required to turn in his cell phone and truck.

As a result of these changes in his employment situation, Mr. Fulks commenced this declaratory judgment action in October, 1997. He sought an order declaring that he was tenured, that he had been improperly reclassified, and that he was entitled to compensation for extra hours he had worked. By letter dated June 10, 1998, Mr. Watson informed Mr. Fulks that he had not been re-elected for employment for the 1998-99 school year and that his final work day was June 30, 1998. Mr. Fulks amended his complaint to challenge his termination.

After hearing the evidence, the trial court dismissed Mr. Fulks's claim that he was entitled to tenure, finding that he failed to show that he had ever affirmatively been granted tenure. *See* Tenn. R. Civ. P. 41.02(2). On the remaining issues, the court determined that the Board had voted to elect Mr. Fulks as a certified employee in April 1994 and had provided no notice of a change in that status. As a non-tenured, certified employee, the court found, Mr. Fulks was entitled to be informed by April 15 that he was not being rehired. The court concluded that because Mr. Fulks received insufficient notice, he was entitled to employment for another school year and back pay. However, the court held that the Superintendent possessed the statutory authority to reassign Mr. Fulks to the duties of maintenance worker and compensate him at the rate of pay for the position assigned. It also held that Mr. Fulks was entitled to some limited compensation for the extra time he worked. Mr. Fulks appealed. For the reasons set out below, we affirm the trial court's decision.

## I. Standard of Review

We turn first to the proper standard of review for the issues presented in this appeal. Because this is an appeal from a decision made following a bench trial, the familiar standard set forth in Tenn. R. App. P. 13(d) governs our review. Accordingly, we must review the record *de novo* under the presumption that the findings of fact are correct "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). We must also give great weight to such factual findings by the trial court that rest on determinations of credibility. *Randolph v. Randolph,* 937 S.W.2d 815, 819

(Tenn.1996).  No presumption of correctness attaches to the trial court's conclusions of law.  Tenn. R. App. P. 13(d); *Hansel v. Hansel,* 939 S.W.2d 110, 111 (Tenn. Ct. App.1996).

## II. Tenure

At the close of plaintiff's proof, the trial court dismissed plaintiff's claim based on tenure, holding that Mr. Fulks did not establish that the Board had affirmatively granted him tenure.  We affirm the trial court's ruling on this issue.

Mr. Fulks argues that he was tenured because he held a teaching license and, by rehiring him after his probationary period had expired, the Board effectively granted him tenure.  Teacher tenure is governed by Tenn. Code Ann. § 49-5-501 - 515, known as the Teacher Tenure Act.  "[T]he basic purpose of the Teacher Tenure Act . . . is to afford a measure of job security to those educators who have attained tenure status.  The General Assembly recognized that the efficient administration of the local educational systems of this state requires stability of programs and trained personnel." *Ryan v. Anderson*, 481 S.W.2d 371, 374 (Tenn. 1972) (citing *State v. Yoakum*, 201 Tenn. 180, 297 S.W.2d 635 (1956)).  Tenn. Code Ann. § 49-5-501(11)(A) (1996) defines "tenure" as the "statutory requirements, conditions, relations and provisions in this part, under which a teacher employed by a board holds a position as a teacher under the jurisdiction of the board."  A teacher who has been granted permanent tenure is entitled to certain procedural safeguards, including charges, notice, hearings, and *de novo* judicial review before he or she can be dismissed or suspended.  Tenn. Code Ann. § 49-5-511 - 513.

The prerequisites for permanent tenure are set forth in Tenn. Code Ann. § 49-5-503(2) (1996), which provides that permanent tenure applies to any teacher who:

> (A) Has a degree from an approved four-year college or to any vocational teacher who has the equivalent amount of training established and licensed by the state board of education;
> (B) Holds a valid professional license based on training covering the subjects or grades taught;
> (C) Has completed a probationary period of three (3) school years or not less than twenty-seven (27) months within the last five-year period, the last year to be employed as a regular teacher; and
> (D) Is reemployed by the board for service after the probationary period.

Teachers do not acquire tenure merely because they satisfy these criteria, however. Tennessee law also provides that:

> Upon completion of the probationary period, any teacher who is reemployed or retained in the system is entitled to the tenure status for which such teacher is qualified by college training and licensing; provided that the superintendent shall

4

notify the board prior to reelection by the board that the teacher, if reelected, will attain tenure status.

Tenn. Code Ann. § 49-5-504(b).

Tenure is never automatically granted, and compliance with the prerequisites of Tenn. Code Ann. § 49-5-503(2) is "merely a condition precedent to *eligibility* for tenure." *Sanders v. Vinson*, 558 S.W.2d 838, 842 (Tenn. 1977) (emphasis in original). "The conference of tenurial status is dependent not only upon service but also upon affirmative action by the Board of Education." *Id.* The Supreme Court has further stated, "Tenn. Code Ann. § 49-5-504(b), which requires notice by the superintendent, is a limitation on Tenn. Code Ann. § 49-5-503(2) . . ." *Reeves v. Etowah City Sch. Bd. of Educ.*, 806 S.W.2d 176, 179 (Tenn. 1991).

The rule in *Sanders* was recently reaffirmed in *Bowden v. Memphis Bd. of Educ.*, 29 S.W.3d 462 (Tenn. 2000), a case in which a teacher who satisfied all the criteria in Tenn. Code Ann. § 49-5-503(2), including the reemployment provision, was informed that he would not be rehired. It was undisputed that the Board of Education was not notified that the teacher would attain tenure status when he was reemployed. The Court held that without the requisite notification given to the Board, the teacher did not achieve permanent tenure status under the Teacher Tenure Act when he was reemployed. Thus, the subsequent decision by the Board not to rehire the teacher was lawful. *Bowden*, 29 S.W.3d at 465-66.

It is clear that, notwithstanding Mr. Fulks's argument to the contrary, Tennessee law requires actual notice to and affirmative action by a board of education before tenure is conferred. Nothing in the record before us shows that the superintendent notified the Board that Mr. Fulks would acquire tenure if he was rehired after the probationary period or that the Board took any affirmative action to grant Mr. Fulks tenure.[3] Thus, even if Mr. Fulks had otherwise satisfied the criteria of Tenn. Code Ann. § 49-5- 503(2), we agree with the trial court that he was not granted tenure.

Mr. Fulks does not assert that the Board affirmatively, with notice, specifically granted him tenure. Instead, he argues that the Board's rehire of him after his probationary period was effectively a grant of tenure, an argument disapproved in the cases discussed above. He also argues that he should be deemed to have tenure because certain administrators omitted his name from a list of employees eligible for tenure that was presented to the Board of Education. Without question, if Mr. Fulks were otherwise eligible for tenure, Tenn. Code Ann. § 49-5-504(B)

> imposes a mandatory duty on the Superintendent to inform the Board before a re-election [reemployment] vote that their vote will grant tenure. *Reeves v. Etowah*

---

[3]The record includes a rehire list of certified personnel, and a number of names are followed by the word "tenure," or by notations indicating how many years remained before tenure eligibility, reflecting how notice was generally provided to the Board. On the one list where Mr. Fulks's name appeared under certified personnel, no notation followed his name.

*City Board of Education,* 806 S.W.2d 176 (Tenn. 1991), leaves no room for doubt
that the statute means what it says.

*Debord v. Bledsoe County Bd. of Educ.*, No. 03A01-9801-CH-00009, 1998 WL 453680 at * 3 (Tenn. Ct. App. Aug. 6, 1998) (perm. app. denied Dec. 21, 1998). However, a superintendent's dereliction of the duty to inform the board of education "cannot negate the [notice] requirement." *Id.* Were this court to interpret the notification requirement as waivable if notice is not given, the language of Tenn. Code Ann. § 49-5-504(b) "would, for all practical purposes, be rendered surplusage." *Bowden*, 29 S.W.3d at 466.

Thus, the trial court was correct in deciding that Mr. Fulks had never been granted tenure. Additionally, we are not convinced Mr. Fulks was eligible for tenure. His entire employment with the Rutherford County Board of Education was in a position which did not require a teaching certificate, and he held no teaching responsibilities or supervisory responsibility over teachers. Tenn. Code Ann. § 49-2-301(f)(1)(FF) provides, "All persons who are employed in a position for which no teaching license is required shall be hired on a year-to-year contract. The superintendent shall provide a person who is employed in such a position fifteen (15) days' notice of non-renewal of the contract before the end of the contract period." This language indicates that persons in such positions do not get tenured in those positions because their employment remains on a year-to-year basis.

Mr. Fulks maintains he was a teacher as that term is defined in Tenn. Code Ann. § 49-5-501(10), which includes "teachers, supervisors, principals, superintendents and all other certificated personnel employed by any local board of education, for service in public, elementary and secondary schools in Tennessee . . ." Whether or not he falls within that definition because he obtained a teaching certificate, such certification was not a requirement of the position he held, and consequently his employment is governed by Tenn. Code Ann. § 49-2-301(f)(1)(FF). State statute requires that persons employed in the following positions hold licenses of qualification: superintendent (or director of schools), Tenn. Code Ann. § 49-2-301; school principals, Tenn. Code Ann. § 49-2-303; teaching supervisors (for the supervision of teaching), Tenn. Code Ann. § 49-2-304; and teachers, Tenn. Code Ann. § 49-5-403.

Additionally, whether or not Mr. Fulks can be considered a teacher under the definitional section of the Act, there are other prerequisites for tenure eligibility, as listed above. We have found no cases directly addressing the issue of whether persons who hold teaching certificates but do not work in a position which requires such licensure are eligible for tenure. However, we think holdings on similar issues provide some guidance. In *Lyons v. Rasar*, 872 S.W.2d 895, 895-97 (Tenn. 1994) the Tennessee Supreme Court determined that a food supervisor was not a "teacher" for purposes of attaining tenure. The plaintiff in that case held a school service personnel certificate issued by the Tennessee Department of Education as a Food Service Supervisor. *Id.* at 896. She maintained, therefore, that she was a certified supervisor within the statutory definition of "teacher." *Id.*

6

In determining that petitioner did not qualify as a "teacher" eligible for tenure under the Act, the Court found that statutory definition includes only those certificated personnel possessing a professional Tennessee teacher's license. *Id.* at 897. In reaching that conclusion, the Court found that one of the statutory prerequisites to attaining permanent tenure was that a teacher hold "a valid professional license based on training covering the *subjects* or *grades* he is teaching." *Id.* (emphasis in original). The Court also found that the specific personnel positions listed in the definition - "teachers, supervisors, principals, superintendents" - are required by law to possess a valid Tennessee teacher's professional license. *Id.*

Although the Court's ultimate holding in *Lyons* was that only those persons holding valid teaching certificates were eligible for teacher tenure, we do not interpret that holding to mean the converse is true: that having such a certificate automatically makes a person tenure eligible when his or her only employment by the school system has been in a position that does not require certification as a teacher. To so find would require us to ignore the prerequisites of certification *in the subjects taught* or that the probationary period *include one-year as a regular teacher.* Tenn. Code Ann. § 49-5-503(2).

In addition, the Teacher Tenure Act also provides that "Administrative and supervisory personnel shall have tenure as teachers and not necessarily tenure in the specific type of position in which they may be employed." Tenn. Code Ann. § 49-5-501(11)(A). The Tennessee Supreme Court has interpreted this provision as giving a person who was a tenured teacher and was also a coach two sets of rights under the Act: "(1) his position as a teacher is protected by tenure, assuming that he has acquired tenure status, and (2) his position as a coach is protected by whatever contract he has with the board to perform coaching duties, but not by tenure." *White v. Banks*, 614 S.W.2d 331, 334 (Tenn. 1981). Since Mr. Fulks's only employment was in a position which was not subject to tenure, his only "rights" would be those attached to that administrative position, whatever those might be. Thus, we think it questionable that Mr. Fulks was even eligible for tenure under the Teacher Tenure Act.

## III. Non-Renewal of Employment

The trial court's conclusion, affirmed herein, that Mr. Fulks was not tenured results in the conclusion that he was not entitled to the protections from discharge or suspension given to tenured employees. He was only entitled to those protections provided by statute or Board policy regarding non-tenured employees.[4] The primary issue involves his right to re-employment absent timely notice of non-renewal.

The re-employment rights due Mr. Fulks are determined, in the first instance, by whether he was a certified or classified employee. State statute does not make a distinction on the basis of whether a person holds a license or certificate. Instead, it provides that persons who are employed

---

[4]The record does not include a contract between Mr. Fulks and the Board, and he does not assert that such a contract existed or that he had any contractual rights separate from those granted by statute or policy.

7

in a position for which no teaching license is required shall be hired on a year-to-year contract and are entitled to fifteen days' notice of nonrenewal before the expiration of the current contract. Tenn. Code Ann. § 49-2-301(f)(1)(FF). Rutherford County Board of Education policy, however, provides that non-tenured, certified employees who are not to be re-employed for the next year must be notified by April 15.

Mr. Fulks was hired as the Property Plant and Maintenance Manager for the school system in January of 1991 and remained in that position until the employment action he now complains of. It is undisputed that the position he held did not require a teaching license or certificate. The Board maintains the position was a classified position and that Mr. Fulks was a classified employee. It also asserts that the fact that Mr. Fulks reinstated his teaching license did not alter his status as a classified employee or the status of his position as a classified, non-certificated position. It further maintains he was employed on a year-to-year basis and his employment for 1997-98 was as a non-certified/classified employee.[5]

Mr. Fulks contends that the school superintendent who hired him intended that he be a certified employee and sent written direction to appropriate staff to so list Mr. Fulks after he had his teaching license reinstated, retroactive to July 1992. The list for re-hire submitted to the Board for the 1992-93 school year listed Mr. Fulks as a classified employee. However, Mr. Fulks was included on the rehire list of certified personnel presented to the Board in April of 1994 and was approved for rehire for the next school year. In April 1995 when the rehire list was presented to the Board, Mr. Fulks was listed as classified. There is little explanation about the change in Mr. Fulks's listing.

The trial court found that Mr. Fulks was a "non-tenured certified employee" because the Board of Education had voted to "elect Mr. Fulks as a certified employee in its minutes of April 1994." The court found that Mr. Fulks was never notified of any change of status from certified to

---

[5] The Board asserts in its brief that "for the 1997/98 school year, the school year at issue and in which Plaintiff was transferred, Plaintiff was re-employed as a non-certified/classified employee." We do not find a re-hire list for the 1997-98 school year in the record. However, the record includes Board minutes from its meeting on August 21, 1997, with an attachment titled "Classified Personnel Action" July 16, 1997-July 25, 1997. That list includes the following entry:

Request for Transfer

| Mitchell Fulks<br>(Approved 7/18/97) | PRESENT: | Central Office, Plant<br>Maintenance & Property Manager |
|---|---|---|
| | PROPOSED: | Maintenance Department,<br>Maintenance Worker |
| | Effective July 15, 1997<br>Superintendent's Request | |

8

classified after the 1994 meeting and that such action could not be taken unilaterally. From the bench, the court stated:

> The first thing I'm going to find is that the School Board in 1994 passed a resolution that nobody knows how Mr. Fulks' name got on, but it says that he is a certified employee. That is of April, 1994. I think it's because of the efforts of Mr. Carlton. I don't know that for sure, but it looks that way to me. . . . [A]s of April, 1994, he was a certified employee, non-tenured certified employee.

The court found that Mr. Fulks, as a non-tenured certified employee, was entitled under statute and under policy of the Board to notification of non-rehiring on or before April 15 of a given year for the upcoming school year.[6] Therefore, the court concluded that the Board had failed to give Mr. Fulks notice he would not be rehired for the 1998-99 school year, since notice of renewal had been sent in June of 1998. The result was that Mr. Fulks was entitled to another year of employment through June 30, 1999.

The trial court obviously relied on the Board's own policies governing "non-tenured certified" employees and implicitly held that the Board could grant more liberal notice requirements than state law required. We agree and note that, by statute, all actions of a superintendent or director of schools are required to be consistent with existing board policy. Tenn. Code Ann. § 49-2-301(f)(1)(HH).

There is merit in the Board's position that the actual holding of a teacher certificate does not take one out of the definition of classified employee as "personnel whose regular employment status does not require certification." However, the then-superintendent and the Board took affirmative action to place Mr. Fulks in the category of certified personnel. The trial court determined that this decision had certain consequences regarding notice of non-renewal of employment under the Board's own policies. We do not disagree, but that conclusion does not affect Mr. Fulks's status as tenured or tenure-eligible under state law.

The Board does not actually appeal the trial court's decision that Mr. Fulks was entitled to another year of employment, but does vehemently argue, however, that Mr. Fulks was a classified, not certified, employee. The Board argues against Mr. Fulks's contention that he was a certified employee because its construes that contention as part of Mr. Fulks's tenure argument. We perceive the distinction between certified and classified personnel to be outcome significant only to the issue of the amount of notice required for nonrenewal. Because the Board has failed to raise the issue of the extra year of employment, the trial court's ruling stands. In any event, the evidence does not preponderate against the trial court's finding that Mr. Fulks was a non-tenured certified employee

---

[6] Mr. Fulks also maintains that when Mr. Watson assumed the superintendent's position he wanted to terminate Mr. Fulks's employment but was informed that the time to notify Mr. Fulks of non-renewal of the contract for the upcoming year had passed. Mr. Watson's testimony is consistent with the basics of this argument. However, we find it of little import to the issue before us since Mr. Watson did not take over until July 1, when it would have been too late to notify either a certified or classified employee of nonrenewal.

9

whose re-employment was governed by the Board's policy specifically covering such employees.

In ruling on this issue, the trial court directed that Mr. Fulks receive back pay from June 30, 1998 until he was placed back at work "calculated at the rate for a maintenance worker for the Rutherford County Board of Education. In the alternative, the County can elect to pay him the salary he would have earned from June 30, 1998 to June 30, 1999 without putting him back to work." Mr. Fulks objects to the trial court's decision that his pay would be set as a maintenance worker instead of the rate of pay for his managerial position. That issue, along with Mr. Fulks's challenge to his transfer in July 1997, must be resolved in the context of the law regarding transfers of school board employees.

## IV. Transfer

The record reflects that from July 1997, when Mr. Watson first removed Mr. Fulks's managerial responsibilities and transferred him to a position as maintenance worker, until the attempted notice of non-renewal of his employment effective June 30, 1998, Mr. Fulks was paid the same salary he had made as Property, Plant and Maintenance Manager. However, his duties were drastically changed. Mr. Fulks argues this transfer, which he calls a demotion, was invalid.

With regard to this issue, the trial court found:

the Superintendent of Schools, under statutory authority, had authority to reassign the Plaintiff's function and assign him to duties of a maintenance worker. . . . Pursuant to Exhibit 15 [the letter notifying Mr. Fulks], superintendent Hulon Watson had the authority to transfer Mr. Fulks as a maintenance worker position effective July 15, 1997.

Mr. Fulks argues that this ruling was in error regarding both the change in duties and the reduction in salary for the 1998-99 school year.

Tennessee Code Annotated § 49-2-301(f)(1)(EE) expressly authorizes superintendents "to employ, transfer, suspend, non-renew and dismiss all personnel, licensed or otherwise, except as provided in § 49-2-203(a)(1) and in chapter 5, part 5 of this title." This provision was added to the statutory list of powers and duties of the superintendent as part of the Education Improvement Act of 1992.

The first referenced exception refers to the statute which gives the Board the duty to elect and contract with, upon the recommendation of the superintendent, tenured or tenure-eligible teachers. Because that statute deals with hiring, it is not relevant herein. The second exception is to the Teacher Tenure Act, Tenn. Code Ann. §§ 49-5-501 *et seq.* The transfer provision of the Act is found in Tenn. Code Ann. § 49-5-510 which, at the time of Mr. Fulks's transfer read:

The superintendent, when necessary to the efficient operation of the school system,

10

may transfer a teacher from one location to another within the school system, or from one type of work to another for which the teacher is qualified and licensed.

The Act defines a transfer as "removal from one (1) position to another position under the jurisdiction of the same board." Tenn. Code Ann. § 49-5-501(12).

Mr. Fulks maintains his transfer is subject to review under the Tenure Act's transfer provision and case law interpreting it. He bases this argument on his contention that he is a tenured teacher and/or that he is a "teacher" as defined in the Act. We have already decided that Mr. Fulks was not tenured. We have found no authority, and neither party has cited any, dealing with whether the transfer of an employee who is a "teacher" as defined in the Act but is not tenured is governed by Tenn. Code Ann. § 49-5-510.[7]

Similarly, there are no cases interpreting the effect of the 1992 amendment regarding transfers and its relationship to the Teacher Tenure Act. However, we must read the transfer amendment in conjunction with the other provisions of the Education Improvement Act. In particular, the transfer section was part of Section 13 of 1992 Tenn. Pub. Act, ch. 535, which added to the list of duties to be assigned to the superintendent and provided:

> Tennessee Code Annotated, Section 49-2-301, subsection (f), is amended by adding thereto the following new subdivisions:
>
> (1) Employ, transfer, suspend, non-renew and dismiss all personnel within the approved budget, except as provided in Section 49-2-203(a)(1) and in Part 5 of Chapter 5 of this title.
>
> (2) All persons who are employed in a position for which no teaching license is required shall be hired on a year-to-year contract. The superintendent shall provide a person who is employed in such a position fifteen (15) days' notice of non-renewal of the contract before the end of the contract period.
>
> (3) The superintendent may dismiss any employee under his jurisdiction for incompetence, inefficiency, insubordination, improper conduct or neglect of duty, provided that no one

---

[7]In *McKenna v. Sumner County Bd. of Educ.*, 574 S.W.2d 527 (Tenn. 1978), the Supreme Court determined the proper standard for judicial review of transfers under the Teacher Tenure Act. The Court used the term "tenured employee" in some instances and simply "employee" in others. *McKenna,* 574 S.W.2d 533-34. The employee at issue in *McKenna* was tenured, as have been the employees whose transfers have been examined under the Act in other cases. *Pullum v. Smallridge*, 652 S.W.2d 338 (Tenn. 1983); *White v. Banks*, 614 S.W.2d at 334; *Mitchell v. Garrett,* 510 S.W.2d 894, 898 (Tenn. 1974); *Pemberton v. Wilson*, 481 S.W.2d 760, 770 (Tenn. 1972)*; Galyon v. Collins*, No. 03A01-9711-CH-00513, 1998 WL 331300 (Tenn. Ct. App. June 24, 1998)(perm. app. denied Nov. 2, 1998). We have found no cases involving challenges to transfers of untenured employees under the Teacher Tenure Act.

11

shall be dismissed without first having been given in writing, due notice of the charge or charges and an opportunity for defense.

(4)     All actions of the superintendents or their designees shall be consistent with the existing board policies, rules, contracts and regulations.

Reading all parts of this provision together, we interpret the legislature's limitation to one year of employment, requiring yearly renewal, for persons in positions for which no teaching license is required as a clear indication of its intent that such persons not be eligible for tenure. That interpretation is consistent with the Tenure Act's transfer provision that a superintendent may transfer a teacher "from one type of work to another for which the teacher is qualified **and licensed**." (emphasis added). This language presumes that the teacher was qualified and licensed for his or her original position, which means a position for which a license is required.

> It is well-settled that the guiding principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope. *State v. Sliger*, 846 S.W.2d 262, 263 (Tenn. 1993). In seeking to ascertain legislative intent, we must look to the entire statute in order to avoid any forced or subtle construction of the pertinent language. *McClain v. Henry I. Siegel Co.*, 834 S.W.2d 295 (Tenn. 1992). Accordingly, statutes 'in pari materia' - - those relating to the same subject or having a common purpose - - are to be construed together, and the construction of one such statute, if doubtful, may be aided by considering the words and legislative intent indicated by the language of another statute. *Belle-Aire Village, Inc. v. Ghorley*, 574 S.W.2d 723, 725 (Tenn. 1978); *Spence v. Miles Laboratories, Inc.*, 810 F. Supp. 952 (E.D. Tenn. 1992).

*Lyons v. Rasar*, 872 S.W.2d at 897.

Therefore, we conclude that the Teacher Tenure Act exception to Tenn. Code Ann. § 49-2-301(f)(1)(EE) does not apply to employees whose only employment in a school system has been in a position for which no license is required.[8]  Mr. Fulks's transfer is subject only to the very broad

---

[8]The Tenure Act's provision authorizes superintendents to transfer even tenured teachers so long as the transfer is not arbitrary and capricious or actuated by political or other improper motives. *Pullum*, 652 S.W.2d at 340; *McKenna*, 574 S.W.2d at 527; *Mitchell*, 510 S.W.2d at 898; *Galyon*, 1998 WL 331300. Thus, even if Mr. Fulks were entitled to the protections afforded tenured teachers, he would be required to show that the transfer was arbitrary, capricious, or due to improper motives. Further, "[W]e must presume that the actions of a board or superintendent are not arbitrary or capricious, but are reasonable and fair unless there is clear evidence to the contrary." *Mitchell*, 510 S.W.2d at 898 (citing *Blair v. Mayo*, 224 Tenn. 108, 450 S.W.2d 582 (1970)). Mr. Fulks has produced no such evidence. While Mr. Watson testified that he had planned to replace Mr. Fulks if he were ever appointed superintendent, that intention was based upon Mr. Watson's dissatisfaction with Mr. Fulks's performance. The superintendent testified that he had problems with Mr. Fulks on two or three occasions, at least one of which raised questions about Mr. Fulks's financial dealings with school

(continued...)

discretion given to the superintendent to transfer employees.[9]  Mr. Fulks has failed to identify any other limitation on the superintendent's discretion.  It is clear that, with the proper amount of notice, the superintendent could have chosen not to renew Mr. Fulk's employment for any reason not otherwise prohibited by law,[10] and we find no basis for establishing a more stringent restriction on the superintendent's authority to transfer.  Accordingly, we affirm the trial court's determination that the superintendent had authority to reassign maintenance worker duties to Mr. Fulks.

Although Mr. Fulks characterizes the employment actions taken (including being relieved of supervisory responsibilities, even though retaining supervisory pay, and the separate reduction of his salary as ordered by the court for the additional year of employment) as a "demotion," that word does not appear in any of the relevant statutes.  The Supreme Court, recognizing that omission, has determined that "demotions" of tenured teachers must be analyzed as either a termination or a suspension.

> *McKenna* involved a transfer of position from a full-time principal of a large elementary school to that of principal and teacher at a smaller elementary school and a reduction in annual salary of $2,145, which the principal alleged was a "demotion." One of the central issues was whether the shift constituted a "dismissal and suspension," § 49-1412, or a "transfer," § 49-1411.  This Court found that only a "transfer had occurred, and held that the statutes and case law restrict tenure to the position of teacher and do not extend to any particular job assignment and that T.C.A. § 49-1411 was separate and distinct from the statutes governing dismissal and suspension.

*Pullum v. Smallridge*, 652 S.W.2d 338, 340 (Tenn. 1983).

Even tenured employees may be transferred to a position with less responsibility and at lower pay.  *Pullum v. Smallridge*, 652 S.W.2d at 340-41 (transfer from principal to teacher at reduced salary); *White v. Banks*, 614 S.W.2d 331 (transfer from teacher and coach to only teacher, with loss of coaching supplemental pay); *Galyon v. Collins*, 1998 WL  331300 at *4-8 (transfer from

---

[8](...continued)
system property.  In addition, while a number of administrators in the school system were satisfied with Mr. Fulks's work, his handling of the job was not without controversy.  Mr. Fulks received an official letter of reprimand from Dr. Ragsdale in October of 1996 for his handling of inmate labor over a period of years, including representations he had made to the body in charge of inmates and his failure to comply with a directive not to use inmate labor around students.

[9]An employee whose position does not require a license has some employment protections.  For example, such an employee may be dismissed during his one-year term of employment only after notice of charges and a hearing and is entitled to board and judicial review of such action.  Tenn. Code Ann. § 49-2-301(f)(1)(GG).  However, a decision not to renew employment or a decision to transfer an employee to another position does not invoke such procedural protections.

[10]For example, employment actions taken because of illegal discriminatory motive are prohibited.  No claim of such motivation has been made in this case.

13

administrative position as attendance supervisor and budget director to teaching position at lower salary). "The fact that such transfer was to a lower-paying teacher position from an administrative position would only have bearing on the question of abuse of discretion." *McKenna*, 574 S.W.2d at 531. Thus, in the teacher tenure context, "demotions" have been analyzed as transfers. Because we have affirmed the transfer to maintenance worker duties, we affirm the trial court's conclusion that Mr. Fulks's salary for the additional year of employment could be commensurate with that of the position he was transferred into.

## V. "Comp Time"

Mr. Fulks also claimed entitlement to compensation for hours he worked in excess of forty hours per week. The policy regarding compensatory time in effect during some of Mr. Fulks's employment allowed employees to take time off from work at least equal to the amount of time they worked in excess of their usual work week. That policy was adopted and/or followed by a former superintendent, Mr. Carlton. After Dr. Ragsdale succeeded Mr. Carlton as superintendent in July or August of 1994, he abolished "comp time" for salaried personnel. Mr. Fulks's claims to payment for accrued but unused compensatory time relate to time periods both before and after July 1994. The trial court's resolution of these issues was based, in large part, on the reasonableness of Mr. Fulks's expectation that he would receive either pay or time off for the extra hours he claimed he worked in view of the policy in effect at the time. In this regard, the trial court found:

> Regarding comp time, Mr. Fulks and others agreed that former superintendent, Elam Carlton, allowed employees to compile such a benefit. Mr. Fulks admitted superintendents since then did not continue this practice . . .

Thus, for the time after July 1994, the trial court found there was no policy which would allow Mr. Fulks to claim or accrue either time off or additional compensation for time worked in excess of his regular work week. The evidence does not preponderate against that finding.

Nonetheless, Mr. Fulks maintains he is entitled to compensatory pay for extra time spent on two projects after Mr. Carlton left office, a renovation project at John Coleman School and repairs of tornado damage at Smyrna Middle School. Mr. Fulks asserted that the school system agreed to pay overtime or provide "comp time," whichever he wanted. He stated that to timely complete the renovation he accrued 112 hours of overtime in a little over a month. Mr. Fulks also testified that he worked many extra hours repairing the tornado damage at Smyrna Middle School. He claimed that the school finance officer told him to keep up with the extra time and he would "probably get paid for that, due to the fact that it was an insurance job."

The financial officer denied that he ever told Mr. Fulks that he would receive "comp time" for renovating John Coleman School. He testified that Mr. Fulks asked about receiving "comp time" in a discussion about repairing the tornado damage at Smyrna Middle School and he responded:

> . . . I said, well, I don't know whether you will or not. I said, I'll take it up with the

Superintendent, but I can't promise it. . . I turned around and asked him [whether he wanted "comp time" or overtime] because if he wanted comp time, he had to declare it on the front. So I said, if you get it, do you want comp time or do you want overtime pay? And he said it really didn't matter to him, as long as it was one or the other.

Mr. Fulks also testified about this conversation, stating that the financial officer

told me to keep up with the time, which I did document, on not only myself but all the maintenance employees, and that time was turned in . . . And he said I would probably get paid for that, due to the fact that it was an insurance job.

Mr. Fulks further testified about a conversation with the financial officer regarding the renovations at John Coleman School:

. . . I said, it will take a lot of overtime. And he said, that's okay, we'll pay it. And I said, yeah, but Dr. Ragsdale has said that we don't need comp time, overtime. He said, which one do you want? And I said, it doesn't matter, whichever one you can work out. And so, he told me - - I can't say he said yes, I will pay you. I can't say that. He just said, which one do you want? And I said, it doesn't matter, whichever one you can work with. And I finished the job and worked 112 hours in that less than 30 days.

The trial court found that although Mr. Fulks stated he "discussed alternatives with Mr. Shirley [the financial officer]. . . They made no agreement." On this basis, the trial court denied Mr. Fulks's request for additional compensation for these two projects. The evidence does not preponderate against the trial court's finding that Mr. Fulks and the financial officer "made no agreement" about extra pay or "comp time" for making the above mentioned repairs and renovations. Consequently, the record supports the trial court's decision not to award compensation for this work which was completed after the school system ceased its policy of providing "comp time." It is undisputed that Mr. Fulks was a salaried employee. Testimony in the record indicates that salaried employees were not entitled to "comp time." Accordingly, we affirm the trial court's denial of "comp time" for the work on Smyrna Middle School and John Coleman School.

Mr. Fulks's other claim for additional compensation rests on hours of "comp time" he asserts he accumulated prior to Mr. Carlton's leaving office as superintendent and accrued during the time the "comp time" policy was in effect. Because of the testimony regarding Mr. Carlton's policy, the court awarded Mr. Fulks some of the time he claimed. On appeal, Mr. Fulks disputes the amount.

The trial court found:

Regarding comp time, Mr. Fulks and others agreed that former superintendent, Elam

15

Carlton, allowed employees to compile such a benefit. . . . Because of this, and based on Exhibit 20 that Mr. Fulks maintained, he is to receive comp time for January through April 1994 only. This amount, after deducting credits reflected on Exhibit 20, shows a balance of ninety-one (91) hours. In the event Mr. Fulks returns to work, he will be allowed to take this time off and be paid for it. In the event Mr. Fulks is not put back to work, but receives a year's salary, he will receive no additional funds for comp time.

Mr. Fulks argues that the trial court erred in finding that he was only entitled to ninety-one (91) hours of "comp time." He maintains that during the time in question, he accrued 1009 hours, and relies on the aforementioned Exhibit 20.

At the close of the trial, the trial court originally ruled that Mr. Fulks was entitled to all the compensatory time he claimed, which was 1009 hours. Later, however, the trial court notified counsel that it intended to modify its earlier ruling to limit Mr. Fulks's accumulated comp time to the amounts shown on Exhibit 20 as earned between January and April 1994. After other filings and a motion to clarify, the trial court entered its final order which decided the issue as set out above. The record does not include a transcript of a hearing on the motion to clarify[11] or otherwise reveal the reason for the trial court's change; however, we surmise that the decision is based upon the lack of evidence in the record for time accumulated prior to 1994.

As proof of his "comp time," Mr. Fulks offered Exhibit 20, three documents entitled "Daily Attendance Record," which consisted of a grid listing the months vertically and the days horizontally across the top. The three such documents were separately dated 1994, 1995, and 1996. They include numbers, reflecting hours, penciled into the grid, most of which were either preceded by a "+" or enclosed in brackets. Because the court determined that compensatory time accrual was not available after July of 1994, none of the documentation after that date is relevant to calculation of the time actually accrued by Mr. Fulks. The "Daily Attendance Record" for 1994 does not reflect the earning of "comp time" after April of 1994, but appears to reflect use of such time. This fact explains the trial court's use of the months January through April.

---

[11]The court's final order states:

Following the hearing of the case and announcement of the Court's ruling from the bench, the Court reconsidered certain aspects of its earlier ruling and sent a letter to counsel dated August 21, 1998, which is adopted herein by reference, and by which the Court made certain amendments to its earlier ruling. Plaintiff's counsel filed a Motion to Clarify in response to the amendments made by the letter of August 21, 1998. The Court heard the Motion to Clarify and Defendant's response thereto on September 27, 1998. In argument of its Motion to Clarify, Plaintiff sought to change certain points of the Court's amendments. The Court declined Plaintiff's request to modify its amendments, and maintained its amendments to its earlier ruling as follows . . .

Thus, the order mentions a hearing on the motion to clarify. We note that the Board filed a Corrected Designation of Additional Parts of the Record which includes an entry titled "Transcript of post-trial hearing." However, the clerk's certificate of appellate record does not list any such transcript as included in the record on appeal.

Mr. Fulks argues that he is entitled to compensatory time he had accrued prior to 1994 and that the 91 hours calculated by the court must be added to that accumulated total. He asserts that the correct figure for the amount accumulated prior to January 1994 is found in a notation on the Daily Attendance Log for 1994. Unfortunately for this argument, that explanation was made for the first time in his attorney's letter to the trial court after receipt of the court's proposed modification of its order. There is no such explanation in the evidence in the record. The only testimony in the record regarding Exhibit 20 is that it depicted overtime Mr. Fulks started accumulating under Mr. Carlton; that his comp time was recorded "hour for hour;" and that Exhibit 20 was a daily log. Mr. Fulks did not explain at trial what any of the notations meant or how he arrived at his figure of over 1000 hours of accumulated comp time. Therefore, based on the evidence at the trial, we conclude that the evidence does not preponderate against the trial court's finding; Mr. Fulks provided testimony and documentary evidence to support only ninety-one hours of compensatory time.[12] As the claimant, he had the burden of proof as to the amount of time due him. *Elrod v. J.C. Penny Life Ins. Co.*, No. M1999-02195-COA-R3-CV, 2000 WL 798651 at *4 (Tenn. Ct. App. Jun. 22, 2000) (no Tenn. R. App. P. 11 application filed); *Hogan v. Coyne Int'l Enterprises Corp.*, 996 S.W.2d 195, 206 (Tenn. Ct. App. 1998); *Winford v. Hawissee Apartment Complex*, 812 S.W.2d 293, 296 (Tenn. Ct. App. 1991).

## VI. Conclusion

Accordingly, we affirm the trial court's determinations that Mr. Fulks did not have tenure, that his transfer to another position was authorized, that he was not eligible for "comp time" for renovating John Coleman School or repairing Smyrna Middle School, and that he is entitled to an additional year of employment through June 30, 1999, that his compensation for that additional year can be based on the salary for the maintenance position into which he was transferred, and that Mr. Fulks was entitled to compensation for 91 hours of "comp time" at the rate of pay in effect at the time he accrued that time. Costs are taxed to the Appellant, Mr. Fulks, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE

---

[12]On appeal, the Board asserts that the trial court correctly limited Mr. Fulks's accrued comp time to the hours earned during the time period from January through April of 1994. The Board does not dispute Mr. Fulks's entitlement to that amount of comp time, apparently acknowledging that the former superintendent allowed salaried employees to earn and take compensatory time off when they worked more than forty hours per week. The Board asserts that in view of the record the trial court acted within its discretion in determining the amount of compensatory time for which Mr. Fulks was due compensation.